**UNITED STATES of America, Appellee,**

v.

**Francis P. TRACEY,
Defendant-Appellant.**

**Nos. 81–1367, 82–1086.**

United States Court of Appeals,
First Circuit.

Argued Jan. 5, 1982.

Decided April 15, 1982.

---

Francis J. DiMento, Boston, Mass., with whom James J. Sullivan, Jr., Constance A. Fitzgerald, and DiMento & Sullivan, Boston, Mass., were on brief, for defendant-appellant.

Amos Hugh Scott, Asst. U. S. Atty., Boston, Mass., with whom William Weld, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, BOWNES and TIMBERS,* Circuit Judges.

* Of the Second Circuit, sitting by designation.

BOWNES, Circuit Judge.

Defendant-appellant Francis P. Tracey was convicted by a jury of three counts of income tax evasion in violation of 26 U.S.C. § 7201 and three counts of filing false income tax returns in violation of 26 U.S.C. § 7206(1). Defendant appeals his conviction and the district court's denial of his post-trial motion for a new trial based on allegedly newly discovered evidence. We granted the government's motion to consolidate the appeals.

Tracey was deputy commissioner of the City of Boston Real Property Department from 1970 to 1978. The Real Property Department, under the control and management of the Real Property Board, was in charge of City-owned public parking lots and garages, which were leased to private companies. As deputy commissioner, Tracey supervised agents of the Department who conducted inspections of the parking facilities and generally was the overseer of the facilities, collecting rents, investigating repair requests, and checking to see that there was compliance with the terms of the leases.

The six counts against defendant related to the years 1975, 1976, and 1977. Using the "net worth and expenditures" method, see McGarry v. United States, 388 F.2d 862 (1st Cir. 1967), cert. denied, 394 U.S. 921, 89 S.Ct. 1178, 22 L.Ed.2d 455 (1969), the government showed that Tracey had a total unreported taxable income of $39,983.48 for the years in question. The additional tax due was $15,951.74. Under the "net worth and expenditures" method, the government has to prove a likely source of taxable income or negate all nontaxable sources; it may, of course, introduce evidence of each. In this case, the prosecution proceeded along both lines of proof.

For evidence that would negate possible sources of nontaxable income, the government called all of Tracey's close living relatives and a number of his friends and associates as witnesses. Each testified that he or she had no knowledge of any loans, gifts,

inheritances, court judgments or cash hoards that would explain appellant's unreported gain in wealth. In addition there was evidence of a wide-ranging investigation conducted by a special agent of the Internal Revenue Service (IRS) which uncovered no nontaxable sources.

The government's proof of a likely source of taxable income consisted of the testimony of one witness, Francis X. Green. Green testified that he had paid bribes to appellant during the time that he, Green, leased parking facilities from the City.

In the summer of 1974 Green was awarded two leases for City-owned parking facilities on which he had bid. That autumn he won another lease and in early 1975 another. The leases ran for a period of a year with rent payable monthly. At the outset of one of his first leases, Green was approached by Tracey and told to continue the former tenant's practice of allowing certain individuals to park for free. Green agreed because, as he testified, he wanted to be on good terms with Tracey, who stood in the shoes of his landlord.

Three of the garages leased by Green were multi-storied and elevator-operated. According to Green, the elevators broke down frequently and were a constant problem. In the spring of 1975 he requested from the Real Property Board a rent abatement of approximately $125,000 to cover the cost of repairs to the elevators.

While the abatement request was pending, Green was told by a parking lot inspector that Tracey wished to meet with him. The meeting was arranged and, in a parking lot under City Hall, Tracey asked Green to contribute $10,000 to Boston Mayor Kevin White's campaign for reelection, telling him that such a contribution would be advantageous to Green. At the time Green said he thought the amount was excessive and later, in another subterranean meeting in Green's car, he handed over $6,000 in cash to Tracey. Green testified that he gave Tracey the money in hopes of a favorable decision on his pending abatement request. He received no receipt for the contribution, nor did the White campaign records reflect a contribution by him or his parking company.

In October 1975 the Real Property Board, after an investigation and recommendation by appellant, granted Green a rent abatement of approximately one-half the amount he had requested.

During the autumn of 1975, when one of Green's leases was scheduled to expire, he asked appellant if there were any way he could continue to operate the garage in order to recoup some of his losses on it. Tracey told him he could stay in business if he made weekly payments of $500 to Tracey. Understanding this arrangement to be in lieu of rent payment to the City, Green made eight or ten payments to Tracey into early 1976, until he received notice from the City that he was in arrears in his rent. In July 1976 the City forbade Green and his various companies from bidding on any more leases for parking facilities and subsequently sued him for back rent owed.

Appellant's first claim is that the trial court committed reversible error in excluding certain evidence relating to bias during the cross-examination of Green. Over a period of almost four hours defense counsel cross-examined Green in an effort to discredit him. Toward the close of his cross-examination, defense counsel attempted to question Green about an incident in which he had been picked up by the local police for drunkenness and taken to the Dedham, Massachusetts, Jail. The purpose of this line of inquiry was to show that Green had telephoned the then-United States Attorney, Edward F. Harrington, who came to the jail and bailed him out. The prosecutor's objection was sustained before any mention was made of Harrington's participation:

Q. [by defense counsel]. On October 12, 1979, you were in the Holiday Inn in Dedham, were you not?

A. I could have been.

Q. And from the Holiday Inn, you went to the Dedham Jail, didn't you?

Mr. Scott: Objection.

The Court: I'm going to sustain this and call for an offer of proof at the side bar.

Defense counsel made the offer of proof and the prosecutor responded by arguing that Harrington had gone to the jail in a personal capacity as Green's friend and that there had been no resultant obligation on Green's part to testify favorably for the government. The trial judge, concerned about having to permit the United States Attorney to testify in rebuttal and the time involved on a matter directed solely to the witness' credibility, ruled the evidence inadmissible.

■■■ The Sixth Amendment right of a criminal defendant "to be confronted with the witnesses against him" includes the right to impeach credibility through cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–1110, 39 L.Ed.2d 347 (1974). Because a witness' bias is " 'always relevant as discrediting the witness and affecting the weight of his testimony,' " the Supreme Court has "recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316–17, 94 S.Ct. at 1110 (citations and footnote omitted). Although the trial judge retains the traditional discretion to limit the scope of cross-examination, discretion in the area of bias evidence becomes operative only after the constitutionally required threshold level of inquiry has been afforded the defendant. *Chipman v. Mercer*, 628 F.2d 528, 530 (9th Cir. 1980); *United States v. Mayer*, 556 F.2d 245, 250 (5th Cir. 1977); *United States v. Bass*, 490 F.2d 846, 857–58 n.12 (5th Cir. 1974); *Wheeler v. United States*, 351 F.2d 946, 947 (1st Cir. 1965). Moreover, the judge's discretionary limitation of cross-examination must be done "with the utmost caution and solicitude for the defendant's Sixth Amendment rights." *United States v. Houghton*, 554 F.2d 1219, 1225 (1st Cir.), *cert. denied*, 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977). *See United States v. Crumley*, 565 F.2d 945, 949 (5th Cir. 1978).

In *Davis v. Alaska* the Supreme Court held that the defendant's constitutional right had been violated where the trial judge prohibited inquiry into a key prosecution witness' status as a probationer, thus completely foreclosing the subject of the witness' potential bias in favor of the state. The case before us, on the other hand, presents a situation in which appellant, although precluded from asking about a specific incident, was permitted to cross-examine the witness extensively regarding his possible motives to testify favorably for the government. The question before us, then, is whether the trial judge abused his discretion in excluding this evidence.

The test for abuse of discretion adopted by some courts where the trial judge limited cross-examination on bias is whether the jury had sufficient other information before it, without the excluded evidence, to make a discriminating appraisal of the possible biases and motivations of the witness. *United States v. Bleckner*, 601 F.2d 382, 385 (9th Cir. 1979); *United States v. Baker*, 494 F.2d 1262, 1267 (6th Cir. 1974); *United States v. Blackwood*, 456 F.2d 526, 530 (2d Cir.), *cert. denied*, 409 U.S. 863, 93 S.Ct. 154, 34 L.Ed.2d 110 (1972); *Flemmi v. Gunter*, 410 F.Supp. 1361, 1371 (D.Mass.1976). We consider this to be essentially the same standard as we recently applied in a case involving cross-examination in the general area of a witness' truthfulness:

> In reviewing the trial judge's exercise of discretion, one factor to be considered is the extent to which the excluded question bears upon character traits that were otherwise sufficiently explored. The court need not permit unending excursions into each and every matter touching upon veracity if a reasonably complete picture has already been developed.

*United States v. Fortes*, 619 F.2d 108, 118 (1st Cir. 1980). *See United States v. Luna*, 585 F.2d 1, 6 (1st Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978).

■■■ Also important in evaluating the propriety of a limitation on cross-examination is the importance of the witness' testimony to the prosecution's case. *United*

States v. Houghton, 554 F.2d at 1225–26. See Chavis v. State of North Carolina, 637 F.2d 213, 226 (4th Cir. 1980); Chipman v. Mercer, 628 F.2d at 532; United States v. Garrett, 542 F.2d 23, 26 (6th Cir. 1976); Wheeler v. United States, 351 F.2d at 947. Especially where the witness is an accomplice of the defendant or may have some other substantial reason to cooperate with the government, the defendant should be permitted wide latitude in the search for the witness' bias. Burr v. Sullivan, 618 F.2d 583, 586–87 (9th Cir. 1980); United States v. Onori, 535 F.2d 938, 945 (5th Cir. 1976). Since we find that the defendant was afforded an opportunity for an extensive attack on the witness' credibility, including his motives for testifying,[1] we examine the witness' testimony to determine whether the jury was in possession of sufficient information to assess his possible bias.

■ For several hours, covering over 130 pages of transcript, defense counsel subjected Green to intensive cross-examination aimed primarily at undermining his credibility. One area into which he delved at length was Green's possible reasons for hostility towards the defendant. Green admitted that several years prior to the time of the bribe transactions he had dealings with the defendant in connection with construction work and that his relationship with him "wasn't too good" at that time. Counsel also elicited the fact that the abatement granted to Green by the Real Property Board was only half the amount he had requested and that this lower amount had been recommended to the Board by Tracey. In addition, Green admitted that, after the

Board's decision to award him an abatement had been reversed, he talked with a newspaper reporter and, subsequently, to the Suffolk County grand jury under a grant of immunity. This evidence provided the basis for counsel's argument to the jury that "Green wanted to shake the city down for those abatements" and, that having failed, Green "decided to nail Tracey."

As for the witness' bias in favor of the prosecution, counsel brought out information tending to show Green's close relationship with the government and reasons he might have for falsifying his testimony. Green admitted he had testified on a prior occasion that he had forged his wife's signature on his income tax returns for two years. Regarding the $6,000 payment to Tracey ostensibly for Mayor White's campaign, he admitted he had been aware that this was an illegal campaign contribution and testified that the money came from his regular practice of skimming from the daily receipts of his parking garages. Green also admitted that he had been questioned by agents of the IRS, and that, although they asked him about large cash purchases, including a used Rolls Royce for $20,000, he had not been indicted for tax evasion. Although he denied that he was testifying against Tracey in return for any promises made by the government,[2] he admitted that for three years prior to the instant trial he had been talking continuously with federal prosecutors.

At the bench conference following the government's objection to the question about the Dedham Jail incident, the prosecutor insisted that there had been no discus-

---

1. We note our belief that the witness was an important factor in appellant's conviction. The government contends, given its two-pronged method of proving appellant's unreported taxable income and the relevance of Green's testimony to only one prong, that Green was not a crucial witness. We do not agree. Although the government in a tax case need not prove both a likely source of taxable income and negate nontaxable sources, it chose to do so in this case. The only evidence presented on the issue of a likely source was the testimony of Green devoted solely to his paying bribes to the defendant in order to secure favorable treatment from his landlord, the City of Boston.

Thus, although the indictment charged Tracey with income tax evasion, the clear message that the prosecution sought to convey to the jury was that the defendant's unreported income derived from being on the take while a City employee. The powerful impression this would have on the jury—indeed, that the government intended it should have—cannot reasonably be denied.

2. He did admit, however, that state authorities had promised him immunity from prosecution in exchange for his testimony before the Suffolk County grand jury.

sion between the witness and Mr. Harrington of any obligation to testify as a quid pro quo for Harrington's assistance. The judge noted that he had allowed extensive cross-examination for nearly four hours because Green was an important witness. In making his ruling to exclude the evidence, he stated his belief that the witness' credibility had been fully explored and expressed his concern that allowing the inquiry would result in the United States Attorney being in the position of having to take the stand to rebut the inference of bias.

Whether or not this evidence should have been admitted presents a question peculiarly within the province of judicial discretion. In light of the other evidence already presented to the jury on the issue of this witness' bias, we do not think the judge abused his discretion in this matter. We are satisfied that the jury was in possession of evidence sufficient to permit it to make a discriminating appraisal of Green's motives to testify without the additional evidence of the Dedham Jail incident.

Appellant contends that the exclusion of the proffered evidence prevented him from making a record from which to argue why the witness might be biased. The record plainly does not support this claim. This is not a case where "the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness ...." *Davis v. Alaska*, 415 U.S. at 318, 94 S.Ct. at 1111. Here, the jury had heard evidence from which it could infer that the government did have a hold over the witness. Notwithstanding Green's protestations that no promises had been made to him by the government, his testimony could reasonably have supported an argument that he was motivated to testify out of a self-interested belief that for favorable testimony he would receive like treatment from the government, even if no deal existed in fact. "What tells, of course, is not the actual existence of a deal but the

witness' belief or disbelief that a deal exists." *United States v. Onori*, 535 F.2d at 945. Counsel had been given ample opportunity to show the witness' bias and to argue supportably from the evidence that the bias sprang from a subjective belief of favorable treatment from prosecutors. In contrast to the *Davis v. Alaska* situation, counsel here was allowed not only "to ask Green *whether* he was biased" but was also permitted "to make a record from which to argue *why* Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." 415 U.S. at 318, 94 S.Ct. at 1111 (emphasis original).

In excluding the evidence after having permitted wide latitude to inquire about sources of bias, "the trial judge did nothing more than exercise his traditional discretion to weigh the probative value of the additional evidence against the twin dangers of unfair prejudice and unnecessary delay in the proceedings." *Flemmi v. Gunter*, 410 F.Supp. at 1372. *See Chipman v. Mercer*, 628 F.2d at 531; *United States v. Nogueira*, 585 F.2d 23, 25 (1st Cir. 1978). We think the trial judge was correct in finding that the probative value of this evidence was slight. The prosecutor's representation at the bench that Harrington had gone to bail the witness out as a friend without exacting any return favor supports this conclusion. *Cf. United States v. Frankenthal*, 582 F.2d 1102, 1106 (7th Cir. 1978) (witness' interest in the litigation establishes a more direct motivation to testify falsely than does a possible friendship bias). To the extent that the evidence might have buttressed an argument for the witness' subjective belief that a deal existed between himself and the government, it was cumulative. Moreover, the Dedham Jail incident occurred more than a year after Green's grand jury testimony which did not differ so significantly from his trial testimony as to indicate that posting the bail had caused him to fabricate.[3] *See United States v. Houghton*, 554 F.2d at 1225.

---

**3.** At oral argument counsel for appellant argued that the defense theory of bias was not that the cause for the bias arose between the

time of the grand jury and the time of trial. Rather, he claimed, the witness called upon Harrington's assistance as a result of an under-

■ Appellant next claims that the trial judge erred in refusing to admit into evidence certified copies of Boston Municipal Court records concerning a civil action brought by the Massachusetts Division of Employment Security against the witness Green. As part of the defense case counsel sought to introduce, several days after Green had left both the witness stand and the state of Massachusetts, a copy of a default judgment entered against the witness and a copy of the certificate of service in that case. The certificate indicated that a summons was served on Green in February of 1979 by leaving a copy at his last known address, a residence in Milton, Massachusetts, and by mailing a copy to the same address. Counsel offered the documents for the purpose of impeachment by contradiction of "something [the witness] denied on the stand." The government objected on several grounds, arguing that the documents were not admissible as prior inconsistent statements under Federal Rule of Evidence 613, as proof of prior conduct under Federal Rule of Evidence 608(b), or as contradicting any of Green's testimony. The court, apparently relying on Rule 608(b), ruled that the evidence was inadmissible as extrinsic evidence of conduct. It noted that the witness should have been given the opportunity on cross-examination to explain or respond, thereby invoking the requirement of Rule 613(b) relative to extrinsic evidence of prior inconsistent statements. Although we base our conclusion on a different analysis, we uphold the trial court's ruling.

Leaving aside the extrinsic nature of the proffered evidence, the starting point for our analysis is a determination of whether the documents, as urged by appellant, in fact contradicted Green's testimony. He was asked on cross-examination if it were true that the Division of Employment Security had brought suit against him in January 1979 for failure to make contributions to the unemployment compensation fund. The witness answered that he was not aware of such a lawsuit and that he had paid his unemployment taxes. During questioning by the government, he had stated that he had not lived in the Boston area since late 1978 and had not resided at the Milton address—the address appearing on the certificate of service—for years.

The documents plainly do not contradict anything the witness said. To contradict is to prove a fact contrary to what has been asserted by a witness. *Black's Law Dictionary* 295 (5th ed. 1979). Green asserted his ignorance of the suit and his payment of the taxes at issue in the suit. Service of process made at an address from which Green stated he had previously moved, although perhaps sufficient for constructive notice, cannot be said to have made him aware in fact of the suit. The default judgment is equally lacking in contradictory effect, both as to his knowledge of the action and as to his payment of the taxes.

Since the documents were unavailing to appellant for his avowed purpose of impeaching by contradiction, it was not improper for the trial judge to consider them for their only other conceivable purpose, as evidence of prior conduct of the witness. Federal Rule of Evidence 608(b) is clear: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence." There was no error.

Appellant also attacks the procedure by which he was sentenced, claiming the court erred in admitting and relying on the government's sentencing memorandum and affidavit. These materials contained information, based on Green's grand jury testimony, concerning other instances of appellant's abuse of his official position in the form of other bribes solicited from Green

---

standing that existed between the witness and the government prior to the grand jury. Not only was this argument not made in the trial court, but it runs counter to the theory relied on by appellant in his brief, namely, that

Green's testimony was colored by the Dedham Jail incident which was "a very real instance of favorable benefits and treatment from the Government[.]"

prior to the prosecution years. In addition, the government requested the court to consider the fact that appellant had not offered to cooperate by coming forward with information about other illegal activity within the Real Property Department of which he was aware.

■ A sentence that is within the statutory limits and is not based on misinformation of a constitutional magnitude is within the discretion of the sentencing judge. *United States v. Tucker*, 404 U.S. 443, 446–47, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). There is no limitation on the type of information the judge may consider in imposing sentence. 18 U.S.C. § 3577.

■ Appellant's challenge to the use of Green's grand jury testimony as uncorroborated hearsay is without merit. Although he claimed at the sentencing hearing that the testimony was unreliable, he did not deny the accuracy of any statements made by Green. The government was not required to corroborate the hearsay in the absence of a specific denial by appellant of the truth of the statements. *See United States v. Fatico*, 579 F.2d 707, 713 (2d Cir. 1978), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980); *United States v. Harris*, 558 F.2d 366, 375 (7th Cir. 1977); *United States v. Cardi*, 519 F.2d 309, 314 (7th Cir. 1975). Moreover, particularly since he had had the opportunity to observe Green as a witness at trial, "the sentencing judge has broad discretion to decide for himself not only the relevance but also the reliability of the sentencing information." *United States v. Morgan*, 595 F.2d 1134, 1138 (9th Cir. 1979).

■ As for the reference to appellant's lack of cooperation with the government regarding the illegal activity of others, the Supreme Court has recently held this to be a legitimate factor in sentencing. *Roberts v. United States*, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980). *See United States v. Miller*, 589 F.2d 1117, 1139 (1st Cir.

1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979).

■ Appellant was sentenced to eighteen months on each tax evasion count and one year on each false return count, all to be served concurrently, and a $15,000 fine. As this was well within the statutory limitations,[4] we will not set it aside. *See Dorszynski v. United States*, 418 U.S. 424, 431, 94 S.Ct. 3042, 3046, 41 L.Ed.2d 855 (1974); *United States v. Foss*, 501 F.2d 522, 527 (1st Cir. 1974).

■ Finally we come to appellant's appeal of the district court's denial of his motion for a new trial on the basis of newly discovered evidence. This motion was predicated on the failure of the government to disclose to appellant that its witness, Francis Green, had worked on United States Attorney Harrington's campaign for Attorney General of Massachusetts in 1974.

The district court decided the motion based on the moving papers, affidavits submitted by both sides, and the trial record. The affidavits showed that Green's activity on behalf of Harrington was limited to stuffing envelopes and making telephone calls for three weeks at the request of a local Harrington supporter who was organizing a fund-raiser. At no time did Green work directly for the Harrington campaign organization. According to the affidavit of Harrington submitted by the government, Harrington did not know Green in 1974 and, when during the prosecution of appellant he heard rumors that Green had once worked for him, he investigated the matter, learned that Green had neither contributed money nor been a part of his campaign organization, and determined that the matter had no relevance to the prosecution of appellant. He did not bring it to the attention of the prosecutor in charge of appellant's case.

"Motions for new trial are directed to the discretion of the trial court." *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir. 1980). We agree with the district court that this evidence does not warrant a new trial. Since appellant does not allege that

---

4. A tax evasion conviction under 26 U.S.C. § 7201 carries a maximum sentence of five years and a $10,000 fine. A conviction under

26 U.S.C. § 7206 for filing a false return carries a maximum sentence of three years and a $5,000 fine.

the government used perjured testimony at trial or failed to respond to a specific defense request for information, he is entitled to a new trial only "if the omitted evidence creates a reasonable doubt that did not otherwise exist[.]" *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976); *United States v. Imbruglia,* 617 F.2d 1, 5 (1st Cir. 1980).

The evidence of Green's brief involvement on behalf of the Harrington campaign seven years prior to the trial of appellant is relevant only insofar as it tends to show a possible bias of the witness in favor of the government. We have already determined that appellant's extensive cross-examination of Green was more than adequate in the general area of impeachment and, specifically, as to bias. We are not persuaded that this additional evidence, of dubious probative value in establishing bias, comes even close to creating a reasonable doubt as to appellant's guilt. In light of the entire record, including the evidence adduced to negate nontaxable sources of income, we are satisfied that the weight of this particular straw would have left the camel's back intact.

*Affirmed.*